1. A ground of a motion for new trial alleging error in an instruction to the jury, but failing to set forth, either literally or in substance, the language complained of, does not present any question for decision as to error in the charge of the court. Page v. Brown, 192 Ga. 398, 400 (5) (15 S.E.2d 506).
2. Aside from two insufficient assignments of error on the charge of the court, as described above, the allegations in the amendment to the motion for a new trial were mere elaborations of the general grounds as contained in the original motion, and therefore the question as to correctness of the judgment refusing a new trial will be determined solely upon a consideration of such general grounds. Peagler v. Huey, 183 Ga. 677 (6) (188 S.E. 906); Lovett v. Gaskins, 23 Ga. App. 623 (4) (99 S.E. 156).
3. Under the pleadings and the evidence, and the stipulation as to the issues to be tried, to wit, that the plaintiffs own no part of lot 99, and the defendants own no part of lots 101 and 102, and that "the sole issue in the case on trial is the true boundary between lot 99 and lots 101 and 102," the defendants could not be harmed by the verdict for the plaintiffs fixing the Browning's Ferry Road as the true boundary line, unless the line as thus fixed would encroach upon lot 99 and the evidence was sufficient to authorize a finding that all of Browning's Ferry Road, as described in the plaintiffs' amendment, was actually within lots 101 and 102, and did not encroach upon any part of lot 99 lying adjacent to said lots 101 and 102 on the northeast.
(a) Even if the evidence for the plaintiffs may not have been sufficient to show that the true original line coincided with Browning's Ferry Road, or to show its definite location elsewhere, yet from the evidence as a whole the jury were authorized to find that such line was situated somewhere where near this road, but on the northeast side of it; and hence that the plaintiffs — in alleging that said line follows the road but, should *Page 624 
said line leave said road to the north, the plaintiffs relinquish all claim to the land lying north of said road, and in thus seeking in effect to have the road established as the true line — did not claim all the land to which they might otherwise have been entitled in lots 101 and 102. Compare Roberts v. Ivey, 63 Ga. 622; Cooper v. Bowen, 140 Ga. 45 (3) (78 S.E. 413); Lokey v. Malcolm, 53 Ga. App. 434
(2) (186 S.E. 448).
4. Under the preceding rulings, the court did not err in overruling the motion for a new trial.
Judgment affirmed. All the Justices concur, except Wyatt, J., who took no part in the consideration or decision of this case.
 No. 15889. SEPTEMBER 6, 1947.
On September 29, 1945, Mrs. Susan N. Bell and A. W. Bell Jr. filed a petition against E. J. Cagle and Marion Cagle, praying that the defendants be enjoined from trespassing upon property claimed by the plaintiffs, described in the petition and including lots 101 and 102 in the 9th District of Hall County. The defendants filed an answer on October 13, 1945, alleging that they owned lot 99 in said district and county, and that the land in dispute was a part of said lot 99. On this date, the judge passed an order, which provided: "It being conceded by the plaintiffs that they own no part of lot 99, and it being conceded by the defendants that they own no part of lots 101 or 102, it appears to the court that the issue in the foregoing matter is the location of the dividing line between lots 99 and 101 and 102, and C. H. Edwards, a surveyor, is hereby appointed and directed to survey and locate said original line between lots 99 and 101 and 102 and to report his findings to this court."
On January 24, 1947, the day the case was tried, the plaintiffs amended their petition as follows: "Now come the plaintiffs in the above-stated matter and amend their original petition by showing that the true line between lot 99, belonging to the defendants, and lots 101 and 102, belonging to the plaintiffs, is a line beginning at Browning's Ferry just north of Browning's Bridge across the Chattahoochee River and running S. 30 E. to the Southern Railroad. Plaintiffs further show that they and their predecessors in title have been in continuous, uninterrupted, adverse possession of land lying southeast of said line between the Chattahoochee River and the Southern Railroad south to lands of L. O. Henson and Hall County Board of Education at White Sulphur Station for over forty years. *Page 625 
Wherefore plaintiffs pray that this, their amendment, be allowed and the above-stated line decreed to be the true line between plaintiffs and defendants. Plaintiffs further show that said line follows the road from Browning's Ferry just north of Browning's Bridge toward the Southern Railroad but, should said line leave said road to the north, plaintiffs relinquish all claim to the land lying north of said road."
It appears from the brief of evidence that the parties agreed and stipulated upon the trial as follows: "It is stipulated by the plaintiffs that they own no part of lot No. 99, and it is stipulated that defendants own no part of lots 101 and 102, and that the sole issue in the case on trial is the true boundary line between lot 99 and lots 101 and 102. It is admitted by the parties they are coterminous owners and the issue is the correct boundary between the lines enumerated."
After the introduction of oral and documentary evidence on behalf of both sides, the jury returned a verdict in favor of the plaintiffs; upon which verdict the court entered a judgment decreeing that the road from Browning's Ferry just north of Browning's Bridge to the Southern Railway is the true line between the property of the plaintiffs and the property of the defendants, and enjoining the defendants from trespassing upon the land of the plaintiffs lying south of said road.
The defendants moved for a new trial upon the usual general grounds, and later amended their original motion by adding one paragraph, which was designated as paragraph 1, and six subparagraphs, which were designated as a, b, c, d, e, and f, respectively. This amendment consisted only of amplifications of the general grounds and arguments in support thereof, except that in subparagraph b it was averred, "And charge of court to vary a straight line, or to change, or cause to be changed the true original land line as set out in the pleadings would also be error;" and in subparagraph d it was alleged that, "In the case before the honorable court, that part of the charge defendants allege as error, which would authorize the jury to consider prescriptive title." No part of the court's charge was set forth, either literally or in substance, nor was any part of it more definitely described than in these two quotations from subparagraphs b and d. The court overruled the motion for new trial as amended, and the defendants excepted. *Page 626 
It appears from the record that according to the original State survey, the true line between the lands of plaintiffs and defendants would begin at the southwest corner of lot 99 and the southeast corner of lot 101, and run thence north 30 degrees west to the Chattahoochee River; lot 99 being thus on the northeast side of such line, and lots 101 and 102 being on the northwest side thereof.
The plaintiffs introduced several witnesses who testified: that they had known the Browning's Ferry Road as described in the petition for many years, some as long as 40 years or more; that they had rented and occupied a part of the land lying south and west of this road, paying rents to one who then claimed the land adversely to the defendants; and that the defendants, so far as the witnesses knew, had never asserted any claim to any of the land south of the road until it was purchased by A. W. Bell, under whom the plaintiffs now claim, Bell having purchased in 1934.
J. B. D. Miller, one of the witnesses, testified: that he had been acquainted with land in the vicinity of this road for around 42 years; that "I don't know where the land lines are up there, but I know where what is known as the Cagle Place is, the Julie Cagle Place they call it. I don't know where the line between the two properties was at, never have known. According to the way they tended it up there, the line between the Bell property and the Cagle property would be north of the road leading down to Browning's Bridge, from the railroad crossing down to the bridge. I guess it would be north; I couldn't tell the north and east part, it might be a little northeast, but still that would be on the north side."
Shown a map that was later introduced in evidence by the plaintiffs, he testified: "This map (indicating) looks pretty much like it. I live right in here (indicating)." According to this map, the Browning's Ferry Road would be within the bounds of lots 101 and 102 (lots of the plaintiffs), and would not at any point touch lot 99, which is owned by the defendants.
J. J. Bailes testified: that he knew where the road from Browning's Crossing crosses the Southern Railroad down to Browning's Bridge, and had known it for about 27 or 28 years; that he tended a part of the land in controversy 3 or 4 years; that he rented the land from Babe Hulsey, who had it in charge for a mining company; that it was generally known in the neighborhood as the mining company property; and that at the time he rented it none *Page 627 
of the Cagles claimed any rent from it, nor were they claiming the land.
Philmore Perry testified: "I know where Browning's Crossing across the Southern Railroad is, and the road leading down from Browning's Crossing to Browning's Bridge, and the road from Browning's Crossing down to Browning's Ferry. I lived there when they built the bridge and laid the road off; we lived in the log cabin at the forks of the road twelve years, in the forks of the old road and new road. We rented from Babe Hulsey; we knew it as the gold-mine property. The Cagles didn't claim any part of it that I know of; they didn't claim any part of the gold-mining property at that time; didn't claim any land immediately south of the place we lived. . . I never heard of the Cagles claiming any land south of the road leading down to Browning's Bridge until Sheriff Lawson and Mr. Bell bought it."
J. T. Bales testified: "I know where the road leading down to Browning's Bridge is; that bridge washed away last spring was a year ago. I know where the old road down to Browning's Ferry is; I have known that property around fifty years; I know where Jim White has been living; his house is on the left side of the road this side of the bridge. . . About forty years ago I tended around that house, on the patch that runs down on this side of the house. I did not own it, but rented it from Mr. Julius M. Hulsey; it was then known as the mining company property; no one but Hulsey ever asked me to pay any rent on it; we tended it some eight or ten years. . . I know where Cagle has put up some wire fence. . . Cagle was not then claiming the land north of the wire fence he put up; it was not then known as the Cagle property. I understood the Cagle property come down to the north or northeast of that road; they were not known to own any property south of that road that I know of. . . I reckon I know where the disputed property is; I tended it. . . That property I tended has never been known as the Cagle land that I know of. I have lived in that community about fifty years."
E. J. Cagle, one of the defendants, testified on cross-examination: "I am one of the defendants in this case; three or four years ago, I brought suit against Sheriff Bell two or three times. I know where Browning's Bridge was; it washed away just a year ago. I have built some fences on the property line just south of Browning's *Page 628 
Bridge, about a lot and a half, maybe more. My grandfather had lots 97, 98, 99 and 100; 97 is in Lula School district; 98 is not. Lula School district line does not cross lot 99. I know where the tin top house is — it crosses on 97. The tin top house is in Lula School district; 97 is in Lula and Glade district. I built these fences practically thirty-three hundred feet south of Browning's Bridge; that is about two-thirds of a mile and down the river south of Browning's Bridge; I don't know that property south of Browning's Bridge has always been mining company. I remember when Mr. Perry lived there and tended it; he paid rent to Hulsey, not to the mining company; Hulsey had the property in charge for himself, he claimed it; the mining company never claimed it; the Cagles claimed it; claimed to William Cagle. I was a kid and didn't know nothing about it; this Mr. Hulsey has been backing us up; he is the man that done all the stealing of the land, and the mining company never has claimed up there; it has always been Hulsey and these other people have tended it. I don't know if Perry paid any rent to the Cagles; I was young and don't know who he paid it to, he probably paid it to Hulsey, Hulsey was the man in possession; Miller paid it to Hulsey; Bales paid it to Hulsey. My mother always said that Mr. Hulsey is in there; she didn't know nothing about it; always that had been in dispute; Hulsey come up there in 1895; the county commissioners and Hulsey went across the river and surveyed a line and taken in the Jim White house, and my mother said to us children, `Never go across that line.' We didn't want to get in trouble with Hulsey; he stole the mining company property there; now I have the facts before me; the Jim White house is about sixteen hundred feet from the road that leads down to Browning's Bridge, a lot and a half north of the property I now claim. We now claim the Jim White house. In 1895 when Hulsey and the county commissioners surveyed through there, the land where the Jim White house now stands was on the Hulsey side. I said the line come across there and took in on the lower side of the land, took in the White house on the east side. The line they surveyed in 1895 is not the line I am claiming now; it is a lot and a half away, about forty-nine hundred feet. I have got a plat here that tells exactly. My mother told us not to go over that line and disturb Hulsey, because when they run the line they would come out and find the facts of the case. *Page 629 
I obeyed my mother; before I crossed the line I wanted to be sure I knew what I was doing; so I goes over to Spring Place, and Alexander Martin's folks directed me to where the original line is, and they pointed out to me where this hickory tree and rock now is, and told me how to get plats, the way it come around. They showed me it was the correct line of William Cagle. Alexander Martin's heirs and a lawyer in Dalton who is now dead told me that. I got my information from a lawyer in Dalton whose father lived up there. My father and Hulsey had an argument over that and came near fighting. After they surveyed the land in 1895, I never claimed anything there until 1933-34. We got pears off them trees. My mother said we didn't want to go across the line and disturb Hulsey because he would put us in jail. I have been as far west as Texas checking land title, and I have checked them all over Georgia; also North and South Carolina, Virginia, West Virginia, Texas, Alabama, and Michigan. I don't spend a good deal of my time checking land titles. I spent two or three months in Texas checking land titles."
On direct examination, this witness testified: "I asserted possession over this land in 1933-34 and have been in possession ever since then; I put up notices and put fences up on the line. I cultivated some of this land in dispute in 1933; my brother took care of that. I nor my tenants have cultivated any of it since 1934. That graveyard is the Jacob Cagle graveyard; it is on the property in dispute; my great, great grandfather, he is the man to whom this lot was originally granted by the State. At the present time only about fifteen or twenty acres of the land in dispute is in cultivation; the rest of it, around 300 acres, is in woods. This is a plat of that property. The line run in 1895 by Hulsey and the county is not the line that Bell is claiming to; that line would be on 915, a lot and a half down below there. The commissioners and Hulsey ran a line in 1895 that come down by where the White house now is; that is not the line Bell is claiming to; I don't know any exact line in there; I don't know all that Bell claims.
"When my brother was on that land in 1933-34, I don't know about Hulsey furnishing him stock; nor that he paid rent to Hulsey; nor that he raised syrup cane there. . . The line run in 1895 was supposed to run north thirty degrees west across there. *Page 630 
I reckon some of this property in dispute is north of that line, or toward Lula."
The brief of evidence recites: "Plaintiff introduced county plat to show those roads and the location of land lots. Admitted without objection."
C. H. Edwards testified: That at the request of the parties he surveyed a line for the purpose of locating the original line between lot 99 and the Bell property; that he made a report of his survey to the court in the form of a plat (which plat was later introduced in evidence by the defendants); that he began his survey at a certain rock corner, and ran a line north 30 degrees west to a hickory tree; that Mr. Cagle was present at the time this rock corner was pointed out to him; and that Mr. Eads, representing the plaintiffs, was also present at that time. "There were several there and asked about the corner and where we were going to start, and they said there was a rock corner up on a little rise and that is where we were to start. We talked about it and nobody agreed to it being a corner and nobody objected to it; just talked; there was an old rock standing up there, looked like it had been there quite a while; and folks got to discussing the direction we would go from this corner. They said to run north thirty degrees west; that was something new to me; that was a different kind of original line to me, and I decided probably they were mistaken about it, and I had a man with me and he could handle the instrument a little, and I told him, if he would keep me on a due north line, I would see if I couldn't find a line. We didn't find any sign of a line on this north line we ran, and then we fooled around there awhile, and some of them said I was running through the middle of a land lot. Then we all just agreed to quit at that and come back down here and see if we couldn't find some information about it. I thought it was just agreed to quit at that and come back down here and see if we couldn't find some information about it. I thought it was just to run a land line from a known corner. I come back down here, and we went to Mr. Telford and told him what they claimed, that the land line ran thirty degrees west of north, and he gave me this sketch to copy by; and he agreed with me, and we discovered it did run on a variation of thirty degrees west of north, and then we went back up there on another day. This gentleman was not there then, I don't believe. We went back to this rock corner, the same corner we were at the first day we were there, and ran the line according to the information I had. They *Page 631 
told me that it ran from that rock to a hickory tree over there near the river. I ran the line through there on that variation, running north thirty degrees west, and ran out to the hickory tree. When I got through, I marked it out; I believe the court order said mark it out, and we did and come on back. I made this plat here indicating exactly what I have testified to. . . Of course I didn't know the numbers of the lots any more than Adam's house eat, but they told me that on the east side was 99 and on the west side was the other number, so I run this line on a variation of thirty degrees west of north. I had heard that they marked trees on the other line, and I found nothing there that indicated a line at all, except an old field that had been grown up in pines. I was running exactly along the edge of that field, on the northeast side of that field, running practically right in the hedgerow, where they had stopped, whoever cultivated the land on the south side. On the west side there was not any cultivation on the other side of the line I ran. That was the only evidence I saw that would indicate there had been a line indicated there by cultivation, and I saw no marked timber. . . Where we went to an old hickory was standing; I didn't examine it for marks. Along the line between the corner and the hickory tree, the only thing we found was we run along the edge of the field. There was nobody objected to it and I presume it was all right. We marked it out and I made this report and filed it in court. I stated there was no land in cultivation on one side of the line I run, but on the other side this field came up to the edge, and I imagine it was ten acres or more. There was none in cultivation at that time on either side of the line. That field was on lot 100; I think the Cagles claim 99; it was on the other land and came up to the line of 99 and stopped there. We ran across the corner, too, a little bit, and then we got a little off of it, and back on, and I noticed in surveying this that somebody had run a line through there, because there was stakes set up all along there; it had been sometime back, but they were there very distinct, right along the way I run; I have no doubt in my mind that it is a correct line, and I don't know as there is any question raised on it. I only know what they told me about this thing: I got this from Mr. Telford here, and it showed 99 and 101, and we discussed the question where was 102, and this will show that I call a little fractional thing there next to the bend *Page 632 
of the river, and we thought maybe that was 102, that little corner up there. This is the plat he give me. The fact that Mr. Telford give me this, which is exactly the same as that, except he claimed the railroad crossing was further north a mile and a half, or something like that. I never knew anything about that corner until he carried me up there sometime after that, but the corner I went to and the corner I understood he went to was the corner at White Sulphur Station crossing the railroad and which runs right along parallel, going along the railroad, going east, and that is where we went, up the railroad until we got to this side of the lot, as I understood it, at this rock corner, and I ran the line the best I could. There was no objection to the running of the line, we just got it in the wrong place is their contention. I don't know any more about which line is which than Adam's house cat; I don't think you would without somebody to show you; just what place you can establish is all you can go by, and when the parties meet and go to a corner and say, "This is the corner,' and nobody disputes it, that is all right. The first time we went up there, we ran a north and south line; I couldn't get it in my mind that it run thirty degrees west, and I was just attempting it from the experience I had in running other land lines; but I did run it through there, but found no evidence of markings, and came back and Mr. Telford told me about it. The first time I went up there, Eads was with me representing Mr. Bell and I think some of you pointed out this gentleman. I don't think he was actually there the time I ran the line that I reported into court. . . We went up the railroad right about the width of a lot before we ran the line; I am just telling you the line I ran; I wouldn't say it was the right or wrong one. They told me the line we ran was about the width of one lot from White Sulphur Station; I wouldn't know whether we marked it right or wrong. . . The line we ran was one lot north of the station, was my understanding. Mr. Telford wrote me that I had run the wrong line; he said something about running another line up there, and I said, `I think I have run about all the lines I want to run.'. . They just all met up there and said, `Here is the corner,' and if anybody objected, I don't remember it. Somebody said they didn't see any use running a line through the middle of that lot, I think."
Eston Eads testified for the plaintiffs: That he helped Sheriff *Page 633 
Bell in his lifetime look after his rent and the upkeep of his buildings; he owned that place at that time. "I know where the Cagle's place is; it starts at the road leading down to Browning's Bridge and runs back this way, about a mile. I did not agree that the corner back at this end of Cagle's place was the corner between the Cagle property and the Bell property; I told him I didn't see any reason for running a line through the middle of the land lot; there was a rock there, it was a rocky hill, it was not the only rock there."
The foregoing is a statement of so much of the evidence as is considered necessary to a review of the judgment refusing a new trial, although it does not purport to contain all of the testimony of the several witnesses above named, or mention all of those who were introduced and testified.